<u>**FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DEBORAH EHLING,** | Civ. No. 2:11-cv-03305 (WJM) |
| **Plaintiff,** | |
| v. | **OPINION** |
| **MONMOUTH-OCEAN HOSPITAL SERVICE CORP.**, *et al.*, | |
| **Defendants.** | |

<u>**WILLIAM J. MARTINI, U.S.D.J.:**</u>

Plaintiff Deborah Ehling filed this action against Monmouth-Ocean Hospital Service Corp. ("MONOC"), Vincent Robbins, and Stacy Quagliana (collectively "Defendants"). This matter comes before the Court on Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**.

### I.     BACKGROUND

Plaintiff Deborah Ehling is a registered nurse and paramedic. Defendant MONOC is a non-profit hospital service corporation dedicated to providing emergency medical services to the citizens of the State of New Jersey. Defendant Vincent Robbins is the President and CEO of MONOC. Defendant Stacy Quagliana is the Executive Director of Administration at MONOC.

Plaintiff was hired by MONOC in 2004 as a registered nurse and paramedic. In July of 2008, Plaintiff took over as President of the Professional Emergency Medical Services Association – New Jersey (the "Union"). As President of the Union, Plaintiff was regularly involved in actions intended to protect MONOC employees. For example, Plaintiff filed complaints with the Environmental Protection Agency ("EPA") and the New Jersey Department of Environmental Protection ("NJDEP"), reporting that MONOC's use of a disinfectant called Zimek was creating health problems for employees. In response, the EPA issued a removal order requiring MONOC to stop

using Zimek.  Plaintiff also testified in the wage and hour lawsuit of another MONOC employee.

Plaintiff's claims in this case arise out of: (1) an incident involving Plaintiff's Facebook account, and (2) Plaintiff's disciplinary record and medical leave.  The Court will summarize the pertinent facts relating to each issue.

### A.  The Facebook Incident

Facebook is a widely-used social-networking website.  The website provides a digital medium that allows users to connect and communicate with each other.  Every Facebook user must create a Profile Page, which is a webpage that is intended to convey information about the user.  The Profile Page can include the user's contact information; pictures; biographical information, such as the user's birthday, hometown, educational background, work history, family members, and relationship status; and lists of places, musicians, movies, books, businesses, and products that the user likes.  A Facebook user can connect with other users by adding them as "Facebook friends."  Facebook users can have dozens, hundreds, or even thousands of Facebook friends.  In addition to having a Profile Page, each user has a webpage called a News Feed.  The News Feed aggregates information that has recently been shared by the user's Facebook friends.  By default, Facebook pages are public.  However, Facebook has customizable privacy settings that allow users to restrict access to their Facebook content.  Access can be limited to the user's Facebook friends, to particular groups or individuals, or to just the user.

Facebook provides users with several means of communicating with one another.  Users can send private messages to one or more users.  Users can also communicate by posting information to their Facebook "wall," which is part of each user's Profile Page.  A Facebook "wall post" can include written comments, photographs, digital images, videos, and content from other websites.  To create a Facebook wall post, users upload data from their computers or mobile devices directly to the Facebook website.  Facebook then saves that data onto its computers (called "servers").  New wall posts are typically distributed to a user's Facebook friends using the News Feed feature.  Users' most recent wall posts also appear at the top of their Profile Pages.  A user's Facebook friends can comment on the wall posts, indicate that they "like" the wall posts, or share the posts with other users.  Facebook users typically do not post information to their Facebook walls with the intent to delete it later.  Instead, Facebook designed its website so that its servers would save this data indefinitely.  As more and more wall posts are added, earlier wall posts move lower and lower down on the user's Profile Page, and are eventually archived on separate pages that are accessible, but not displayed.[1]

---

[1] For information about how Facebook works, *see* Mark Allen Chen, *Interactive Contracting in Social Networks*, 97 Cornell L. Rev. 1533, 1542 (2012); James Grimmelmann, *Saving Facebook*, 94 Iowa L. Rev. 1137, 1142-50 (2009); *United States v. Jeffries*, No. 3:10-CR-100, 2010 WL

During the 2008-2009 timeframe, Plaintiff maintained a Facebook account and had approximately 300 Facebook friends.  Plaintiff selected privacy settings for her account that limited access to her Facebook wall to only her Facebook friends.  Plaintiff did not add any MONOC managers as Facebook friends.  However, Plaintiff added many of her MONOC coworkers as friends, including a paramedic named Tim Ronco.  Plaintiff posted on Ronco's Facebook wall, and Ronco had access to Plaintiff's Facebook wall.  Unbeknownst to Plaintiff, Ronco was taking screenshots of Plaintiff's Facebook wall and printing them or emailing them to MONOC manager Andrew Caruso.  Ronco and Caruso became friends while working together at a previous job, but Ronco never worked in Caruso's division at MONOC.  The evidence reflects that Ronco independently came up with the idea to provide Plaintiff's Facebook posts to Caruso.  Caruso never asked Ronco for any information about Plaintiff, and never requested that Ronco keep him apprised of Plaintiff's Facebook activity.  In fact, Caruso was surprised that Ronco showed him Plaintiff's Facebook posts.  Caruso never had the password to Ronco's Facebook account, Plaintiff's Facebook account, or any other employee's Facebook account.  Once Caruso received copies of Plaintiff's Facebook posts, he passed them on to Quagliana, MONOC's Executive Director of Administration.

On June 8, 2009, Plaintiff posted the following statement to her Facebook wall:

> An 88 yr old sociopath white supremacist opened fire in the Wash D.C. Holocaust Museum this morning and killed an innocent guard (leaving children).  Other guards opened fire.  The 88 yr old was shot.  He survived.  I blame the DC paramedics.  I want to say 2 things to the DC medics.  1.  WHAT WERE YOU THINKING? and 2.  This was your opportunity to really make a difference! WTF!!!!  And to the other guards….go to target practice.

After MONOC management was alerted to the post, Plaintiff was temporarily suspended *with* pay, and received a memo stating that MONOC management was concerned that Plaintiff's comment reflected a "deliberate disregard for patient safety."  In response, Plaintiff filed a complaint with the National Labor Relations Board ("NLRB").  After reviewing the evidence, the NLRB found that MONOC did not violate the National Labor Relations Act.  The NLRB also found that there was no privacy violation because the post was sent, unsolicited, to MONOC management.

---

4923335, at *5 n.3 (E.D. Tenn. Oct. 22, 2010); *Facebook, Inc. v. Power Ventures, Inc.*, No. 08-5780, 2009 WL 1299698, at *1 (N.D. Cal. May 11, 2009); *Lane v. Facebook, Inc.*, No. 08-3845, 2009 WL 3458198, at *1 & n.1 (N.D. Cal. Oct. 23, 2009); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 989 n.50 & 51 (C.D. Cal. 2010).

### B.  Plaintiff's Disciplinary Record and Medical Leave

MONOC disciplines employees in accordance with a "point" system.  According to MONOC's written disciplinary policy, an employee who commits an infraction (such as being late to work) is given one point.  Points accumulate if there are further infractions, and points accumulate more quickly if an employee commits the same infraction multiple times.  Accumulating a certain number of points results in a disciplinary action.  A MONOC employee who accrues seven, eight, or nine points is suspended, and an employee who accrues ten or more points is terminated.  An employee can appeal any disciplinary action.

During the seven years that Plaintiff was employed at MONOC, Plaintiff developed an extensive disciplinary record.  Plaintiff received six warning notices for lateness, and eleven additional warning notices for violations of MONOC policy, including unauthorized late swipe-outs, excessive call-outs, failing to have sufficient paid time off to cover hours not worked, refusing 9-1-1 calls, and failing to submit the proper documentation for her ambulance shifts.  In 2010, after receiving numerous warning notices, Plaintiff began to accrue disciplinary points.  Plaintiff steadily continued to accrue disciplinary points throughout 2010 and 2011.

During her employment at MONOC, Plaintiff also took numerous medical leaves.  The Family and Medical Leave Act (or "FMLA") entitles employees to take up to twelve weeks of medical leave to recover from serious health conditions.  Plaintiff took five continuous FMLA leaves for five different medical conditions, and also took intermittent FMLA leave over the course of approximately two years.  Despite taking numerous medical leaves, Plaintiff frequently missed the deadlines for submitting FMLA paperwork, submitted paperwork that was incomplete or inaccurate, or failed to submit paperwork altogether.  Nevertheless, MONOC granted Plaintiff all the FMLA leave that she requested, alerted Plaintiff when her paperwork was insufficient, sent her forms two or three times when she missed the deadlines, and even applied FMLA leave retroactively when she failed to make a timely request.

For example, on May 8, 2011, Plaintiff was dispatched to respond to a 9-1-1 call for a critically ill twenty-month old child.  Plaintiff refused to do the emergency transport and placed her unit out of service, citing "FMLA reasons."  On May 20, 2011, MONOC sent Plaintiff the FMLA paperwork, and asked for clarification on her medical condition.  Plaintiff did not respond.  Two weeks later, MONOC sent the paperwork to Plaintiff again, and Plaintiff responded by submitting a partially-complete form that did not contain any information from her doctor.  MONOC followed up by asking Plaintiff to have a doctor sign the form, but Plaintiff never responded.  Shortly thereafter, on June 8, 2011, Plaintiff filed the Complaint in this case.

Throughout this time period, Plaintiff continued to accrue disciplinary points for committing infractions such as arriving late to work.  By July 2011, Plaintiff had accrued eight disciplinary points.  On July 15, 2011, Plaintiff was issued a two-day suspension.  However, MONOC's upper management (including Quagliana) determined that the suspension should be stayed so that Plaintiff could continue working.  This meant that all disciplinary action would be put on hold for one year and then removed from Plaintiff's record, provided that Plaintiff did not accrue any more points.  On July 17, 2011, just two days after her suspension was stayed, Plaintiff skipped her evening shift to attend a "metaphysical seminar" featuring purported psychic medium James Van Praagh.  When asked why she was not coming to work, Plaintiff cited "FMLA" reasons.  In the following days, Plaintiff continued to be late to work, and by July 22, 2011, she had accumulated a total of twelve disciplinary points.  Plaintiff was then issued a notice of termination.  However, MONOC's upper management determined that the termination should be stayed.  Thus, neither the suspension nor the termination was ever enforced.

On August 18, 2011, Plaintiff filed a nine-count Amended Complaint in this case.  On September 9, 2011, Defendants filed a motion to dismiss.

In October 2011, Plaintiff exhausted her twelve weeks of FMLA leave.  Plaintiff told MONOC that she needed additional medical leave at that time, so she was offered a ninety-day personal leave of absence.  MONOC sent Plaintiff the leave of absence forms twice, extending the deadline each time, but Plaintiff did not fill out the forms.  Eventually, Quagliana filled out the forms herself and then approved them.  Plaintiff's leave of absence was set to expire on January 18, 2012.  On January 2, 2012, Plaintiff informed MONOC that she would not be returning to work until the end of March 2012.  Plaintiff was informed that she could not take additional leave unless she filled out reasonable accommodation forms.  MONOC sent Plaintiff the reasonable accommodation forms twice, but Plaintiff never completed them.  Because Plaintiff never returned to work and never filled out the reasonable accommodation forms, Plaintiff was terminated on February 7, 2012.  Plaintiff did not appeal her termination.

On March 8, 2012, Plaintiff's attorney withdrew from the representation.  He was replaced by Plaintiff's brother.  On May 30, 2012, this Court entered an Opinion and Order dismissing Count 2 of the Amended Complaint.  In July 2012, Plaintiff voluntarily dismissed Counts 8 and 9 of the Amended Complaint.  Defendants now move for summary judgment on the remaining counts.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-

23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party.  *Andreoli v. Gates*, 482 F.2d 641, 647 (3d Cir. 2007).

## III.    DISCUSSION

Only six counts of the Amended Complaint remain:

(1) Count 1:  Violation of the Federal Stored Communications Act;
(2) Count 3:  Violation of the Family Medical Leave Act;
(3) Counts 4 and 7:  Violations of the New Jersey Law Against Discrimination;
(4) Count 5:  Violation of the Conscientious Employee Protection Act; and
(5) Count 6:  Invasion of Privacy.

Defendants move for summary judgment on each of the remaining counts.  The Court will address each count in turn.

### A.  Count 1:  Federal Stored Communications Act

In Count 1, Plaintiff asserts a claim for violation of the Federal Stored Communications Act (or "SCA"), 18 U.S.C. §§ 2701-11.  Plaintiff argues that Defendants violated the SCA by improperly accessing her Facebook wall post about the museum shooting.  Plaintiff argues that her Facebook wall posts are covered by the SCA because she selected privacy settings limiting access to her Facebook page to her Facebook friends.  Defendants disagree and argue that, even if the SCA applies, the facts in this case fall under one of the SCA's statutory exceptions.  For the reasons set forth below, the Court finds that non-public Facebook wall posts are covered by the SCA, and that one of the exceptions to the SCA applies.  The Court will address each issue in turn.

### i.  The SCA Covers Non-Public Facebook Wall Posts

The first issue before the Court is whether the SCA applies to Facebook wall posts.  Very few courts have addressed this issue.  *See* Catherine Crane, *Social Networking v. the Employment-at-Will Doctrine: A Potential Defense for Employees Fired for Facebooking, Terminated for Twittering, Booted for Blogging, and Sacked for Social Networking*, 89 Wash. U.L. Rev. 639, 668 (2012) ("Very few courts, however, have ruled on whether other unique features found within social networking sites — such as wall posts, status updates, notes, pictures, etc. — could also be protected against employer intrusion under the SCA").  For the reasons set forth below, the Court finds that Facebook wall posts fall within the purview of the SCA.

In 1986, Congress passed the Electronic Communications Privacy Act, which was intended to afford privacy protection to electronic communications. *See* Pub.L. No. 99-508, 100 Stat. 1848; *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002). Title II of the Electronic Communications Privacy Act contains the SCA, which was designed to "address[ ] access to stored wire and electronic communications and transactional records." S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557. "The legislative history of the [SCA] suggests that Congress wanted to protect electronic communications that are configured to be private." *Konop*, 302 F.3d at 875; *see also* S. Rep. No. 99-541, at 35-36, 1986 U.S.C.C.A.N. at 3599 ("This provision [the SCA] addresses the growing problem of unauthorized persons deliberately gaining access to . . . electronic or wire communications that are not intended to be available to the public."); H.R. Rep. No. 99-647 at 41, 62-63 (1986) (describing the Committee's understanding that the configuration of an electronic communications system would determine whether an electronic communication was accessible to the public).

Because the SCA was passed in 1986, the statute "is best understood by considering its operation and purpose in light of the technology that existed in 1986." William Jeremy Robison, *Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act*, 98 Geo. L.J. 1195, 1204 (2010). Computer networking was in its infancy in 1986. *Id.* at 1198. In the mid-1980s, "personal users [had just begun] subscribing to self-contained networks, such as Prodigy, CompuServe, and America Online." *Id.* After connecting to a network via a modem, users could download or send e-mail to other users, access a closed universe of content, and post messages on electronic bulletin board systems ("BBS's"). *Id.* A BBS was "a computer program that simulate[d] an actual bulletin board by allowing computer users who access[ed] a particular computer to post messages" for a community of people. *United States v. Riggs*, 739 F. Supp. 414, 417 n.4 (N.D. Ill. 1990). Notably, the SCA was enacted before the advent of the World Wide Web in 1990 and before the introduction of the web browser in 1994. *Id.* "Despite the rapid evolution of computer and networking technology since the SCA's adoption, its language has remained surprisingly static." *Id.* at 1196. Thus, the "task of adapting the Act's language to modern technology has fallen largely upon the courts."[2] *Id.*

The SCA provides that whoever "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters or prevents the authorized access to a wire or electronic communication while in electronic storage in such a system" shall be liable for damages. 18 U.S.C. § 2701(a); 18 U.S.C. § 2707 (providing for civil liability under the statute). The statute further provides that "[i]t shall not be unlawful . . . [to] access an electronic communication made through an

---

[2] Most courts, including this one, would prefer that Congress update the statute to take into account the invention of the Internet. As the Ninth Circuit observed, "until Congress brings the laws in line with modern technology, protection of the Internet . . . will remain a confusing and uncertain area of the law." *Konop*, 302 F.3d at 874.

electronic communication system that is configured so that such electronic communication is readily accessible to the general public." 18 U.S.C. § 2511(2)(g)(i).  In other words, the SCA covers: (1) electronic communications, (2) that were transmitted via an electronic communication service, (3) that are in electronic storage, and (4) that are not public.  Facebook wall posts that are configured to be private meet all four criteria.

First, Facebook wall posts are electronic communications.  The SCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system."  18 U.S.C. § 2510(12).  To create Facebook wall posts, Facebook users transmit writing, images, or other data via the Internet from their computers or mobile devices to Facebook's servers.  Mark Allen Chen, *Interactive Contracting in Social Networks*, 97 Cornell L. Rev. 1533, 1542 (2012) ("When Alice uploads the picture to Facebook, she sends a copy of that data over the Internet.  Facebook then saves that data onto its computers (called 'servers').").  Thus, Facebook wall posts are electronic communications.  *See Konop*, 302 F.3d at 876 (finding similar website postings to be electronic communications under the SCA).

Second, Facebook wall posts are transmitted via an electronic communication service.  The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Facebook provides its users with the ability to send and receive electronic communications, including private messages and Facebook wall posts.  Accordingly, Facebook is an electronic communication service provider.  *See Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 982 (C.D. Cal. 2010) (finding that Facebook and MySpace are electronic communication service providers).

Third, Facebook wall posts are in electronic storage.  The SCA distinguishes between two different types of electronic storage.  The first is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof."  18 U.S.C. § 2510(17)(A).  The second type of storage is defined as "any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17)(B).  Unlike email, Facebook wall posts are not held somewhere temporarily before they are delivered.  *Crispin*, 717 F. Supp. 2d at 989 ("[I]n in the context of a social-networking site such as Facebook or MySpace, there is no temporary, intermediate step for wall postings or comments.").  Rather, the website itself is the final destination for the information.  *Id.* (citing *Snow v. DIRECTV, Inc.*, No. 04-515 (RGM), 2005 WL 1226158, at *3 (M.D. Fla. May 9, 2005)).  Thus, Facebook wall posts are not held in temporary, intermediate storage.

However, Facebook does store electronic communications for backup purposes. When Facebook users post information, the information is immediately saved to a Facebook server.  When new posts are added, Facebook archives older posts on separate

8

pages that are accessible, but not displayed. *Crispin*, 717 F. Supp. 2d at 990 n.51 ("As more and more wall postings or comments are added . . . earlier wall postings . . . [are] eventually archived to separate pages."). Because Facebook saves and archives wall posts indefinitely, the Court finds that wall posts are stored for backup purposes. *See id.* at 989 n.50 ("*Theofel*, *Quon*, and *Konop* implicitly held that although a user may have other purposes for . . . leaving a post on his or her Facebook wall . . . one of multiple purposes may be for backup storage"). Accordingly, Facebook wall posts are in electronic storage.

<u>Fourth</u>, Facebook wall posts that are configured to be private are, by definition, not accessible to the general public. The touchstone of the Electronic Communications Privacy Act is that it protects private information. The language of the statute makes clear that the statute's purpose is to protect information that the communicator took steps to keep private. *See* 18 U.S.C. § 2511(2)(g)(i) (there is no protection for information that is "configured [to be] readily accessible to the general public"); *see also Konop*, 302 F.3d at 875 ("The legislative history of the [Electronic Communications Privacy Act] suggests that Congress wanted to protect electronic communications that are configured to be private"). Cases interpreting the SCA confirm that information is protectable as long as the communicator actively restricts the public from accessing the information. *See Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 265 (S.D.N.Y. 2008) (holding that SCA prevented Viacom from accessing YouTube "videos that [users] have designated as private and chosen to share only with specified recipients"); *Crispin*, 717 F. Supp. 2d at 991 (finding that SCA protection for Facebook wall posts depends on plaintiff's use of privacy settings); *cf. Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1321 (11th Cir. 2006) ("an express warning, on an otherwise publicly accessible webpage" is insufficient to give rise to SCA protection).

Facebook allows users to select privacy settings for their Facebook walls. Access can be limited to the user's Facebook friends, to particular groups or individuals, or to just the user. The Court finds that, when users make their Facebook wall posts inaccessible to the general public, the wall posts are "configured to be private" for purposes of the SCA. The Court notes that when it comes to privacy protection, the critical inquiry is whether Facebook users took steps to limit access to the information on their Facebook walls. Privacy protection provided by the SCA does not depend on the number of Facebook friends that a user has. "Indeed, basing a rule on the number of users who can access information would result in arbitrary line-drawing" and would be legally unworkable. *Crispin*, 717 F. Supp. 2d at 990; *see also* Crane, 89 Wash. U.L. Rev. at 641 ("The fulcrum in [the privacy] balancing act exists as one, seemingly obvious, factor: privacy settings.").

At least one other court has determined that non-public Facebook wall posts are covered by the SCA, albeit in a slightly different context. In *Crispin*, the District Court for the Central District of California was asked to decide whether a third-party subpoena

should be quashed under the SCA.  *Crispin*, 717 F. Supp. 2d at 976.  The defendants in *Crispin* subpoenaed information located on the plaintiff's MySpace and Facebook pages, including the plaintiff's Facebook wall posts and MySpace comments.  *Id.* at 968-69. The plaintiff sought to quash the subpoena, arguing that the SCA prohibited Facebook and MySpace from disclosing the information.  *Id.* at 969.  To determine whether the SCA applied to these communications, the court analogized a Facebook wall post to technology that existed in 1986:  a posting on a BBS.  *Id.* at 980.  A BBS could be configured to be public or private.  *See Kaufman v. Nest Seekers, LLC*, No. 05-6782, 2006 WL 2807177, at *5 (S.D.N.Y. Sept. 26, 2006).  If a BBS was configured to be private, access to the BBS was restricted to a particular community of users, and the messages posted to the BBS were only viewable by those users.  *See Crispin*, 717 F. Supp. 2d at 980-82.  The *Crispin* court recognized that there was a long line of cases finding that the SCA was intended to reach private BBS's.  *Id.* at 981(collecting cases). The court then found that there was "no basis for distinguishing between a restricted-access BBS and a user's Facebook wall or MySpace comments":  both technologies allowed users to post content to a restricted group of people, but not the public at large. *Id.* at 981.  The court therefore concluded that, if the plaintiff's Facebook page was configured to be private, then his wall posts were covered by the SCA.  *Id.* at 991.  This Court agrees in all respects with the reasoning of *Crispin*.

Accordingly, the Court finds that non-public Facebook wall posts are covered by the SCA.  Because Plaintiff in this case chose privacy settings that limited access to her Facebook wall to only her Facebook friends, the Court finds that Plaintiff's Facebook wall posts are covered by the SCA.

### ii.   The SCA's Authorized User Exception Applies in this Case

Having concluded that the SCA applies to the type of communication at issue in this case, the Court next evaluates whether either of the SCA's statutory exceptions apply.  The SCA "does not apply with respect to conduct authorized (1) by the person or entity providing a wire or electronic communications service; [or] (2) by a user of that service with respect to a communication of or intended for that user."  18 U.S.C. §2701(c); *see also Pietrylo v. Hillstone Rest. Grp.*, No. 06-5754, 2009 WL 3128420, at *2 (D.N.J. Sept. 25, 2009) ("According to the SCA, if access to [a restricted website] was authorized by a user of that service with respect to a communication of or intended for that user, there is no statutory violation") (internal quotations omitted).  For the reasons set forth below, the Court finds that the authorized user exception (the second exception) applies in this case.

The authorized user exception applies where (1) access to the communication was "authorized," (2) "by a user of that service," (3) "with respect to a communication . . . intended for that user."  18 U.S.C. § 2701(c)(2).  Access is not authorized if the "purported 'authorization' was coerced or provided under pressure."  *Pietrylo*, 2009 WL

3128420, at *3.  In this case, all three elements of the authorized user exception are present.

      <u>First</u>, access to Plaintiff's Facebook wall post was "authorized."  18 U.S.C. § 2701(c)(2).  The undisputed evidence establishes that Ronco voluntarily provided Plaintiff's Facebook posts to MONOC management without any coercion or pressure.  Caruso testified at his deposition that Plaintiff's Facebook friend Ronco voluntarily took screenshots of Plaintiff's Facebook page and either emailed those screenshots to Caruso or printed them out for him.  Certification of M. Elizabeth Duffy Ex. C 42:20-43:3, 45:11-22, ECF No. 36-1.[3]  This information was completely unsolicited.  Caruso never asked Ronco for any information about Plaintiff and never requested that Ronco keep him apprised of Plaintiff's Facebook activity; in fact, Caruso was surprised that Ronco showed him Plaintiff's Facebook postings.  Ex. C 43:6-8, 44:23-45:1, 52:11-17, 53:4-8, 62:19-21, 87:18-88:1.  Caruso never had the password to Ronco's Facebook account, Plainitiff's Facebook account, or any other employee's Facebook account.  Ex. C 44:7-9, 88:13-21.  Caruso's deposition testimony is supported by additional evidence, including a copy of a May 10, 2009 email from Ronco to Caruso attaching copies of Plaintiff's Facebook posts, Quagliana's testimony that she never asked Caruso or anyone else to provide her with a copy of Plaintiff's Facebook page, and Caruso's NLRB affidavit.  Ex. H, D 619; Ex. E 47:9-49:6; Ex. H, D 425.

      Plaintiff provided no evidence to support her theory that access to her Facebook page was unauthorized.  In the Amended Complaint, Plaintiff alleged that Defendants gained access to her Facebook page because a "member of upper management summoned a MONOC employee, who was also one of Ms. Ehling's  Facebook friends, into his office" and "coerced, strong-armed, and/or threatened this employee into accessing his Facebook account on the work computer in the supervisor's presence."  Am. Compl. ¶ 20.  After discovery, it became clear that this was not the case.  Instead, the evidence reflected that Ronco voluntarily shared this information with Caruso.  Plaintiff now surmises that Ronco must have shared the information for "compensation or privileged treatment or a really good deal."  Ex. B 139:5-11.  But this theory does not make sense in light of MONOC's management structure.  Ronco never worked in a division that Caruso oversaw, and Caruso never had control over Ronco's pay or bonuses, so Caruso was not in a position to offer Ronco any sort of benefit.  Ex. C 53:11-19, 86:3-10.  Furthermore, Plaintiff's theory is pure speculation.  Plaintiff did not depose Ronco because Ronco was "traveling in an RV" and no longer worked for MONOC.  Ex. C 62:2-3.  And Plaintiff produced no other evidence that Ronco provided information in exchange for compensation (or some other benefit).  Thus, the undisputed evidence shows that access to Plaintiff's Facebook wall post was authorized.

---

[3] Hereinafter, citations to the Certification of M. Elizabeth Duffy will be referred to using only the Exhibit number.

<u>Second</u>, access to Plaintiff's Facebook wall post was authorized "by a user of that service."  18 U.S.C. § 2701(c)(2).  A "user" is "any person or entity who (A) uses an electronic communications service; and (B) is duly authorized by the provider of such service to engage in such use."  18 U.S.C. § 2510(13).   It is undisputed that Ronco was a Facebook user:  Plaintiff acknowledged that she added Ronco as a Facebook friend and posted on Ronco's Facebook wall.  Ex. B 150:17-152:16.

<u>Third</u>, Plaintiff's Facebook wall post was "intended for that user."  18 U.S.C. § 2701(c)(2).  Based on the privacy settings that Plaintiff selected for her Facebook page, Plaintiff's wall posts were visible to, and intended to be viewed by, Plaintiff's Facebook friends.  Am. Compl. ¶ 11.  On June 8, 2009, when Plaintiff posted the comment about the museum shooting, Ronco was one of Plaintiff's Facebook friends.  Ehling Cert. Ex. A 155:8-21, ECF No. 38.  Thus, the post was intended for Ronco.

In conclusion, access to Plaintiff's Facebook wall post was authorized by a Facebook user with respect to a communication intended for that user.  Therefore, the authorized user exception applies and Defendants are not liable under the SCA.  Accordingly, the motion for summary judgment on Count 1 is **GRANTED**.

## B.  Count 3:  Family Medical Leave Act

In Count 3, Plaintiff asserts a claim for violation of the Family Medical Leave Act, 29 U.S.C. § 2601.  Defendants move for summary judgment.  The Court finds that summary judgment should be granted on Count 3.

The Family and Medical Leave Act was enacted for several purposes, one of which was to "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601 (b)(2).  An employee is entitled to take twelve weeks of FMLA leave if that employee has a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  An employer may require an employee to submit a certification to support the request for leave, which should include information such as the date on which the condition began, the probable duration of the condition, and the appropriate medical facts.  29 U.S.C. § 2613 (b).  An employer may also require an employee to obtain recertification if the "circumstances described by the previous certification have changed significantly." 29 C.F.R. § 825.308; 29 U.S.C. § 2613 (e).  A certification is "considered insufficient if . . . the information provided is vague, ambiguous, or non-responsive."  29 C.F.R. § 825.305.

Two distinct causes of action are recognized under the FMLA: (1) an "interference" claim, where a plaintiff alleges that an employer interfered with her right to take FMLA leave; and (2) a "retaliation" claim, where a plaintiff alleges that the employer took an adverse employment action against her in retaliation for taking FMLA leave.  *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009); 29 U.S.C. § 2615 (a).  Plaintiff asserts both causes of action in this case.

12

Plaintiff failed to proffer evidence to support her FMLA interference claim. To assert an interference claim, an employee "only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Sommer v. The Vanguard Grp.,* 461 F.3d 397, 399 (3d Cir. 2006). In this case, the evidence demonstrates that: Plaintiff took five continuous FMLA leaves; Plaintiff took multiple intermittent FMLA leaves; Plaintiff frequently missed the deadlines for filing FMLA certifications, filed certifications with inaccurate information, or failed to file certifications altogether; Defendants nevertheless granted Plaintiff all the FMLA leave that she requested; Defendants alerted Plaintiff when her paperwork was insufficient, sent her forms two or three times when she missed the deadlines, and even applied FMLA leave retroactively when Plaintiff failed to make a timely request; and Plaintiff exhausted her twelve weeks of FMLA leave in October 2011. Ex. B at 65-69, 70, 73-74, 76, 79-81, 99, 100-01, 106-08, 122; Exs. G12, G16, G19, G23, G24. In her brief, "plaintiff admits that defendants eventually gave her the FMLA leaves," but she objects to the fact that "she received leave only after MONOC rejected plaintiff's paperwork on several occasions." Opp. Br. at 29, ECF No. 39. Under the FMLA, Defendants clearly had a right to request FMLA certifications and re-certifications from Plaintiff, and to reject the insufficient certifications that she submitted. In fact, given the circumstances, Defendants were extremely accommodating of Plaintiff's many FMLA requests.

Plaintiff also failed to proffer evidence to support her FMLA retaliation claim. To establish a *prima facie* retaliation claim, a plaintiff must point to evidence in the record showing that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 301-02 (3d Cir. 2012). In two sentences of her brief, Plaintiff argues that there was retaliation because, "[a]lthough defendants eventually granted Ms. Ehling the FMLA leave she was entitled to, it was only after repeated denials of her . . . FMLA paperwork." Opp. Br. at 29. Requiring Plaintiff to clarify information on her FMLA certification is not an adverse employment decision. And Plaintiff does not point to any other evidence that she suffered an adverse employment decision as a result of taking medical leave.

Accordingly, the motion for summary judgment on Count 3 is **GRANTED**.

## C.  Counts 4 and 7:  New Jersey Law Against Discrimination

In Counts 4 and 7, Plaintiff asserts retaliation claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12. In Count 4, Plaintiff alleges that Defendants retaliated against her for testifying in her co-worker's wage and hour case. In Count 7, Plaintiff alleges that Defendants retaliated against her for filing this lawsuit. Defendants move for summary judgment on both counts, arguing that Plaintiff waived the right to bring such claims when she filed a claim under the New Jersey Conscientious Employee Protection Act (or "CEPA"), N.J.S.A. 34:19-1. The Court agrees.

CEPA's waiver provision provides that:

> [T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19–8.  Although not every NJLAD claim is waived by the assertion of a CEPA claim, "retaliation claims under the LAD necessarily fall within the CEPA waiver provision."  *Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d 425, 465-66 (D.N.J. 2009); *see also Bowen v. Parking Authority of the City of Camden*, No. 00-5765, 2003 WL 22145814, at \*24 (D.N.J. Sept. 13, 2003); *Sandom v. Travelers Mtg. Servs., Inc.*, 752 F. Supp. 1240, 1244 (D.N.J. 1990).  Because both of Plaintiff's NJLAD claims are retaliation claims, they fall within the CEPA waiver provision.

Accordingly, the motion for summary judgment on Counts 4 and 7 is **GRANTED**.

### D.  Count 5:  Conscientious Employee Protection Act

In Count 5, Plaintiff asserts a CEPA claim, arguing that Defendants retaliated against her for reporting the Zimek pesticide issue.  Defendants move for summary judgment.  The Court finds that summary judgment should be granted on Count 5.

To establish a *prima facie* case of retaliation under CEPA, a plaintiff must demonstrate: (1) a reasonable belief that the employer's conduct was violating either a law, rule, regulation or public policy; (2) she performed a "whistle blowing" activity as described in N.J.S.A. 34:19-3a or c; (3) an adverse employment action was taken against her; and (4) a causal connection existed between the whistle-blowing activity and the adverse employment action.  *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2003); *Klein v. Univ. of Med. & Dentistry of New Jersey*, 377 N.J. Super. 28, 38 (App. Div. 2005); *Kolb v. Burns,* 320 N.J. Super. 467, 476 (App. Div. 1999). In this case, Plaintiff demonstrated that she had a reasonable belief that MONOC's use of Zimek violated environmental regulations, and that she performed whistle blowing activity by reporting this issue to the EPA and NJDEP.  However, Plaintiff failed to demonstrate the last two elements of her CEPA claim.

<u>First</u>, Plaintiff failed to demonstrate that an adverse employment action was taken against her.  CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  N.J.S.A. 34:19-2(e).  Plaintiff asserts that, in retaliation for reporting the Zimek issue, Defendants disciplined her for infractions that she did not commit.  The record reflects the exact opposite situation:  that Defendants chose **not** to punish Plaintiff for the numerous infractions that she **did** commit.  According to MONOC's progressive disciplinary policy, a MONOC employee who

14

accrued eight disciplinary points would be suspended, and an employee with ten or more disciplinary points would be terminated.  Ex. H at D8.  The record reflects that Plaintiff accrued eight disciplinary points and was issued a notice of suspension, and then accrued a total of twelve disciplinary points and was issued a notice of termination.  *See* Ex. H at D5-D10; Ex. I at PERS 230-32, 241, 243, 245, 273, 279, 282, 293, 295, 297, 308.  However, in spite of Plaintiff's disciplinary record and MONOC's rigid disciplinary policy, MONOC management decided not to enforce the suspension or the termination, and instead allowed Plaintiff to continue working.  Ex. I at PERS 230-32; Ex. L 103:5-15, 105:2-24.  Because the evidence shows that MONOC bent over backwards ***not*** to discipline Plaintiff, Plaintiff cannot demonstrate that an adverse employment action was taken against her.

Second, Plaintiff failed to demonstrate that a causal connection existed between her whistle-blowing activity and any adverse employment action.  To prove causation, a plaintiff must show that "the retaliatory discrimination was more likely than not a determinative factor in the [adverse employment] decision."  *Donofry v. Autotote Sys., Inc.*, 350 N.J. Super. 276, 293 (App. Div. 2001).  The evidence in this case demonstrates that Plaintiff was not terminated for whistle-blowing activity or even for disciplinary reasons; Plaintiff was terminated because she went out on medical leave and never returned to work.  Plaintiff exhausted her twelve weeks of FMLA leave and a ninety-day personal leave of absence, and then informed MONOC that she would not be returning to work for several more months.  To allow Plaintiff to take additional time off, MONOC sent Plaintiff reasonable accommodation forms twice, but Plaintiff never completed or returned the forms.  Because Plaintiff did not return to work or fill out the reasonable accommodation forms, Plaintiff was terminated on February 7, 2012.  Plaintiff had the right to appeal her termination, but she chose not to exercise that right.  Thus, the facts in the case show that Plaintiff's termination had nothing to do with her whistle-blowing activity.

Accordingly, the motion for summary judgment on Count 5 is **GRANTED**.

### E.  Count 6:  Invasion of Privacy

In Count 6, Plaintiff asserts a claim for common law invasion of privacy.  Plaintiff's claim is premised on Defendants' alleged unauthorized "accessing of her private Facebook postings" regarding the museum shooting.  Am. Compl. ¶ 78.  Defendants argue that they are entitled to summary judgment on the privacy claim because Plaintiff's friend "freely chose to share the information" with Defendants.  Mot. Summ. J. at 11.  The Court finds that summary judgment should be granted on Count 6.

A claim for invasion of privacy under New Jersey law will succeed if a plaintiff brings forth evidence showing that (1) there was an intentional intrusion "upon the solitude or seclusion of another or his private affairs," and that (2) this intrusion would highly offend the reasonable person.  *Bisbee v. John C. Conover Agency, Inc.*, 186 N.J.

Super. 335, 339 (App. Div. 1982).  Under the first prong, a defendant must commit an intrusive act.  *See* Restatement (Second) of Torts § 652B (1977) ("The intrusion itself makes the defendant subject to liability"); *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989) (according to the Restatement, an actor must "commit [an] intrusive act" to be liable for invasion of privacy).  "The converse of this principle is, however, of course, that there is no wrong where defendant did not actually delve into plaintiff's concerns."  *Bisbee*, 186 N.J. Super at 340.  Plaintiff faces a high burden in asserting a cause of action based on intrusion of seclusion.  *Stengart v. Loving Care Agency, Inc.*, 201 N.J. 300, 316-17 (2010).

In this case, Plaintiff failed to show that there was an intentional intrusion by any of the Defendants.  In the Amended Complaint, Plaintiff alleged that Defendants gained access to her Facebook page because a "member of upper management summoned a MONOC employee . . . into his office" and "threatened this employee into accessing his Facebook account."  Am. Compl. ¶ 20.  Now that discovery is complete, it is clear that there is no evidentiary support for these allegations.  The evidence does not show that Defendants obtained access to Plaintiff's Facebook page by, say, logging into her account, logging into another employee's account, or asking another employee to log into Facebook.  Instead, the evidence shows that Defendants were the passive recipients of information that they did not seek out or ask for.  Plaintiff voluntarily gave information to her Facebook friend, and her Facebook friend voluntarily gave that information to someone else.  *See* Ex. C 43:6-8, 44:23-45:1, 52:11-17, 53:4-8, 62:19-21, 87:18-88:1; Ex. E 47:9-49:6; Ex. H, D 425, D 619.  This may have been a violation of trust, but it was not a violation of privacy.

Accordingly, the motion for summary judgment on Count 6 is **GRANTED**.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED**.  An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: August 20, 2013**

16